# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# MIAMI DIVISION
# CIVIL CASE NO.

| | | |
|---|---|---|
| **TALISHA COOPER,** individually and as personal representative for **the estate of Antwon Leonard Cooper,** <br> *Plaintiff,* <br><br> **v.** <br><br> **CONSTANT ROSEMOND,** individually and in his official capacity as a Sergeant for the City Of Miami's police department, and the **CITY OF MIAMI**, a Florida political subdivision, <br> *Defendants.* | §§§§§§§§§§§§§§§ | **JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW Plaintiff, **TALISHA COOPER,** individually and as personal representative for the estate of her deceased son **ANTWON COOPER**, who was an unmarried man with no children at the time of his death by law caused by law enforcement, by and through her undersigned attorneys, and files this her Original Complaint against the Defendants, **CONSTANT ROSEMOND**, individually and in his official capacity as Sergeant of the City of Miami's police department (hereinafter "SGT Rosemond" or "Rosemond"), and the **CITY OF MIAMI**, a Florida political subdivision, (hereinafter "City of Miami" or "City"), collectively "Defendants," and so states:

## I. INTRODUCTION/NATURE OF THIS ACTION

1.   This is an action for damages and attorney's fees under 42 U.S.C. §1983 and §1988

for deprivation and violations of clearly established constitutional rights pursuant

to 42 U.S.C. §1983, and Florida common and statutory laws including wrongful death and survival statutes, wherein SGT Rosemond shot black male Antwon Cooper in the head on Tuesday, March 8, 2022, during a traffic stop initiated by Officer Olivier Gonzalez at the stop sign/non-traffic light intersection of NW 71st Street and 10h Ave., adjacent to Miami Northwestern Senior High School ("school"), and killed Antwon with that one shot.

2. The body-worn camera, eyewitness statements, and crime scene photos clearly show Antwon was unarmed at the time, and that SGT Rosemond did not identify himself as a police officer before using lethal force as a first resort.

3. No reasonable officer would have responded as Rosemond did, and the only other Officer on the scene did not respond as Rosemond did, with Gonzalez never once drawing or using any weapon against Antwon.   Rosemond acted in the scope of his employment and under color of law in his non-discretionary functions when violating the clearly established constitutional rights of Antwon Cooper.

## II. **JURISDICTION/VENUE/PARTIES**

4. Jurisdiction is properly invoked and founded in this court pursuant to 42 U.S.C.§§ 1983 and 1988, the Fourth and Fourteenth Amendments to the United States Constitution, and common and tort laws of Florida. Supplemental jurisdiction for additional state law claims is proper pursuant to 28 U.S.C. § 1367(a) because they form part of the same case or controversy, the Florida Wrongful Death Act §§768.16 - 768.28.   Plaintiff seeks damages in excess of the jurisdictional limits of $75,000 exclusive of costs and interest.

5. Venue is proper under 28 U.C.S. § 1391(b)(2) because a substantial part of the

events or omissions accruing these claims occurred in this judicial district and division.

6.  Plaintiff, TALISHA COOPER, **(**"Plaintiff" or "Ms. Cooper**),** at all times material hereto has been over the age of 18 years, a resident of Miami, Miami-Dade County, Florida, and otherwise *sui juris*, as was the same for her deceased son ANTWON COOPER ("Antwon" or "Mr. Cooper") at the time of his death.

7.  Defendant, CONSTANT ROSEMOND ("SGT Rosemond" or "Rosemond") was at all times material hereto a duly appointed on-duty law enforcement officer of the City of Miami's police department, acting under color of law, who shot and killed Antwon on March 8, 2022.  CONSTANT ROSEMOND is being sued in his individual capacity.

8.  Defendant, CITY OF MIAMI ("City" or "City of Miami") is a political subdivision of Florida, at all times material hereto, also having ultimate authority and/or final decision-making authority over the City of Miami's police department and its officers.  Defendant SGT Rosemond was an on-duty employee of the City of Miami's police department acting within the scope of his employment at the time of the incident at issue and all times material hereto.

9.  Plaintiff has met all conditions precedent to proceed with this action.

## III. GENERAL FACTS

10.  On Tuesday, March 8, 2022, SGT Rosemond shot Antwon in the head and killed Antwon with that one shot during a traffic stop initiated by Officer Olivier Gonzalez ("Officer Gonzalez" or "Gonzalez"), with that traffic stop commencing around 4:35 PM EST at the stop-sign at the non-traffic light intersection of NW 10th

Ave. and 71st St. adjacent to Miami Northwestern Senior High School ("scene").

11. The Death Certificate signed by the Miami-Dade County Medical Examiner lists only one cause of death for Antwon Cooper:

    A.  Manner of Death:  Homicide

    B.  Cause of Death:  Gunshot Wound of Head

    C.  Describe how injury occurred:  Decedent shot by police officer.

    No other factors are listed as contributing to Antwon's death.

12. There were only two eyewitnesses at the scene during SGT Rosemond killing Antwon: Officer Gonzalez who initiated the traffic stop, and Rodney Bullard ("Rodney" or "Mr. Bullard"), the front-seat passenger in Antwon's car.

13. There were only two video devices capturing this encounter:  Officer Gonzalez' body-worn camera ("BWC") and the external video recording of the school, collectively "video footage." Per the City, Rosemond was not wearing BWC.

14. At no time during this encounter with Antwon did Officer Gonzalez pull or brandish any weapon against Antwon, including Gonzalez' baton, taser, or gun.

15. Immediately prior to pulling up behind Antwon approaching the stop-sign where Gonzalez initiated the traffic stop, Gonzalez' BWC shows that Antwon's car was in full view of Gonzalez when Gonzalez initiated the traffic stop.

16. Antwon had just left work and picked up Rodney when Gonzalez initiated the traffic stop.  Antwon was 34 years old, engaged, and had not yet had children.

17. Gonzalez' BWC showed that Antwon had a Florida temporary/paper tag properly placed on the back of the vehicle. Antwon and his fiancé had just bought the used 2016 four-door red Nissan Altima from a used car dealer less than a week earlier.

18. At the driver's side window of Antwon's car, Officer Gonzalez requested Antwon's license, registration, and insurance.  Antwon tendered his registration and a picture ID, truthfully informing Officer Gonzalez that he did not have a license and was going to court concerning his license.

19. Gonzalez accepted those documents and then asked Antwon's passenger Rodney if Rodney had a driver's license, to which Rodney responded, "no sir."

20. During this time, Gonzalez also asked Antwon if he had a weapon, to which Antwon responded "no" and opened his book bag to show Gonzalez; and looked in the back seat of the car after instructing Antwon to roll down the backseat windows of the car, wherein the car was tinted and Gonzalez had stopped the car under a very large tree overshadowing the area. Gonzalez later testified in his sworn statement that he pulled Antwon over for speeding and tint.  No measurement/clocking of speed or tint was recovered in the Investigation file.

21. Gonzalez then instructed Antwon to exit the vehicle.  Antwon complied.

22. At the time, Antwon was wearing a dark t-shirt type short sleeve shirt and drooping red shorts.  He had long dreads extending almost waist-length.

23. At all times material hereto prior to Gonzalez instructing Antwon to exit the vehicle, the BWC shows Gonzalez was standing upright at the driver's side window looking into the car where Antwon and Rodney were sitting down, and the car windows were down.  All of Antwon's and Rodney's actions and words prior to Antwon exiting the vehicle were clearly compliant, visible, audible, and understandable to Officer Gonzalez.

24. Gonzalez initiated a pat down and Antwon attempted to flee.

25. However, Gonzalez grabbed Antwon's shirt so that Antwon was unable to flee.

26. Antwon attempted to free his shirt from Gonzalez' grasp, causing Antwon and Gonzalez to go through the brief motion of an upright/standing shirt-tussle as a result of Gonzalez holding on to Antwon's shirt and Antwon trying to loosen the shirt from Gonzalez' grasp.

27. At no time during this upright shirt-tussle did Gonzalez pull any of Gonzalez' weapons, threaten to pull any weapon, or call for emergency back-up.

28. At no time during this upright shirt-tussle did Antwon pull or brandish any weapon, or threaten to pull or brandish any weapon, against Officer Gonzalez.

29. At no time during this shirt-tussle did either Gonzalez or Antwon strike one another, kick, punch, pummel, beat, or threaten harm to one another.

30. Passenger Rodney remained sitting quietly in the front passenger seat of Antwon's car.

31. At no time did Officer Gonzalez or Rodney see Antwon in possession of a gun, throw/discard a gun, or any gun fall from Antwon during this entire encounter.

32. During the shirt-tussle, the BWC clearly shows Antwon's red shorts hanging down at least half-way below Antwon's waist, to where half of his underwear and/or undershirt are/is visible.  At no time is a gun or any weapon visible on Antwon, seen falling or dislodging from Antwon's clothing, nor is Antwon seen discarding any gun or weapon.

33. Contrary to the statement released to the public by the MDSAO, SGT Rosemond did not "arrive on the scene to find Cooper on top of Officer Gonzalez, with Gonzalez doing all he could do to control Cooper's hands....shouted several

commands to Cooper which went unheeded, leading Rosemond to fire one round from his service weapon"

34. Instead, SGT Rosemond –who was not called to the scene by Officer Gonzalez -- drove up and saw Officer Gonzalez and Antwon both visibly upright in that shirt-tussle with no use of any weapons or imminent serious bodily harm, with neither Gonzalez or Cooper using or reaching for any weapon during this non-lethal up-right tussle.

35. Officer Gonzalez was not crying out for help or backup.  Officer Gonzalez was not using any weapon nor threatening use of any weapon against Antwon or Rodney. Antwon was not using any weapon, threatening use of any weapon, brandishing any weapon; or kicking, punching, beating, or pummeling Officer Gonzalez.  Gonzalez was holding on to Antwon's shirt and Antwon was trying to loosen his shirt from Officer Gonzalez' grasp.

36. Gonzalez and Antwon fell, also described as a "fall" by FDLE and Gonzalez himself; not a push or use of physical or aggravated aggression by Antwon against the body of Officer Gonzalez, nor a take-down by Gonzalez by Antwon.

37. Rosemond was already on the scene at that time, which was unknown to Gonzalez, Antwon, and Rodney.

38. The BWC clearly shows Antwon trying to get up from the fall to flee, while Officer Gonzalez kept Antwon in that fall position, at some point even holding onto Antwon's shirt and dreadlocks in a tight grasp and locked into Gonzalez' grasp.

39. At no time during this fall does either Officer Gonzalez or Antwon reach for any weapon, use any weapon, draw or brandish any weapon, threaten use of any

weapon, punch, kick, pummel, or beat one another.  Antwon was not using ag-gressive or aggravated physical force toward anyone on the scene.

40. At no time during this fall does Gonzalez see, feel, or sense any gun or weapon on Antwon.

41. <u>Within less than one minute of SGT Rosemond arriving on that scene where he saw Antwon and Officer Gonzalez upright in a shirt tussle with no weapons in use, nobody in imminent danger of serious bodily harm or death and then fall, and without any use of lesser force,</u> SGT Constant Rosemond deployed lethal force of shooting Antwon in the head.  In fact, Rosemond was close enough to have simply assisted Gonzalez to subdue Antwon.

42. *To wit*, Rosemond had time to make a perfect aim for his intended target Antwon and intended target area on Antwon's head to ensure that despite Antwon and Gonzalez being on the ground together at the same location, Rosemond's one fatal shot only hit Antwon in the head and did not hit Officer Gonzalez, who was not even aware SGT Rosemond was on the scene when Rosemond shot Antwon.

43. In fact when giving his sworn testimony to  FDLE on the night of the shooting, Officer Gonzalez stated he was not aware that SGT Rosemond had arrived on the scene until after Rosemond shot Antwon; all he heard was a "male voice" (later identified as SGT Rosemond post-shooting) yell out "something" that even Gon-zalez could not understand despite Gonzalez being an officer and Rosemond be-ing his direct supervisor, and "bang" (that being the sound of Rosemond's dis-charging his gun).

44. Officer Gonzalez was in the same location as Antwon when Officer Gonzalez

could not understand the "something" the "male voice" yelled out and then shot.

45. Eyewitness Rodney, who was still in the car and thereby closer to Rosemond which allowed him to hear what Rosemond said unlike Gonzalez and Antwon at their location, stated SGT Rosemond "came out of nowhere," said "get down get down" and shot. Rodney stated Rosemond shot within two or three seconds of the shirt tussle beginning and had a better view of that tussle before shooting.

46. Even if Gonzalez or Antwon had been able to understand SGT Rosemond in their location, there would not have been any time for anyone to comply before being shot.

47. Officer Gonzalez then learned Antwon had been shot after the "bang," stood up from the fall, look around and saw SGT Rosemond, and shouted "Whoa!"

48. Officer Gonzalez stood and checked himself to ensure he was not harmed from SGT Rosemond shooting into the location where he and Antwon were in that same location from the fall.

49. SGT Rosemond stood walking around still holding his gun pointed out in a shooting stance.  SGT Rosemond did not render or offer any medical aid to Antwon.

50. Antwon's body laid out in the middle of the intersection with blood seeping from behind his head.

51. Antwon didn't have a license and Gonzalez had never run the registration information Antwon gave, so Rosemond had no idea of any criminal history status Antwon could have had before killing Antwon.

52. Nobody on that scene was in imminent danger of death or serious bodily injury when SGT Rosemond used deadly force as his first level of force as opposed to a

last resort, and did not use the minimum force necessary or less-lethal force nec-

essary and available to him to gain custody or control over Antwon.

53. No reasonable officer would have used the lethal force utilized by SGT Rosemond, and Officer Gonzalez – who was the officer initiating the traffic stop and actively engaged in the shirt tussle with Antwon -- did not use a baton, taser, incapacitation, or a gun, even before the fall.

54. Contemporaneously with pulling the trigger and yelling out the undiscernible "get down get down" to Antwon and Gonzalez, Rosemond shot Antwon in the head.

55.  Further, SGT Rosemond did not identify himself as a police officer.

56. An officer is required to render medical aid to a person in that officer's custody and control or arrested by the officer where the officer's actions caused injury to the person pursuant to Fourteenth amendment due process.

57. But after Rosemond, a police <u>Sergeant,</u> shot unarmed Antwon in the head, Rosemond did not even render or attempt to render any aide.  It was Officer Gonzalez who brought medical attention to the "gentleman" who had been shot, as he termed Mr. Antwon Cooper.

58. Passenger Rodney was still sitting quietly in the front passenger seat where he'd been this entire encounter since the traffic stop began.

59. Officer Gonzalez was able to get up from the ground without assistance.

60. Neither Officer Gonzalez, SGT Rosemond, nor passenger Rodney Bullard were transported to the hospital or admitted to the hospital from the scene.

61. All three were able to ambulate, talk, and give statements – although Rosemond

refused to give a statement.

62. Nobody on that scene was in imminent danger of serious bodily harm or death until SGT Rosemond came on the scene and unlawfully shot Antwon in the scope of Rosemond's employment and under color of law in violation of Antwon's clearly established constitutional rights to be free from excessive force and deadly force in Rosemond's non-discretionary function. SGT Rosemond was the danger.

63. The Investigation File shows multiple pictures of the scene of the car and Antwon's body lying out in the intersection with blood profusely saturating the road under Antwon's head.

64. None of the pictures of the scene show any gun or weapon on, next to, or in the area where Antwon's body is lying on the roadway.

65. None of the multiple pictures of the scene from multiple angles show any gun or weapon inside Antwon's car, in front of Antwon's car, or even on the same side of the road where Antwon's car was located, with Gonzalez' car and Rosemond's car on the same side of the street as Antwon's car, parked in tandem, respectively.

66. As a matter of fact, the Investigation File shows that the first time a gun was seen on the scene by any eyewitness which was not either of the Officer's guns was only after Rosemond shot Antwon, and that gun was not seen on or in use by Antwon, but on the other side of the road, and visibly several feet away and nowhere near where Antwon's body laid.

67. That gun was not traced to Antwon, nor conclusively matched to Antwon.

68. It was never on the BWC, school footage, or seen by eyewitnesses, in the possession of Antwon.

69. First responders and paramedics were not able to save Antwon and he was pro-
nounced dead on the scene.

70. Other officers also arrived on the scene in response to Gonzalez' call for medical
aid and back-up call after Rosemond shot Antwon.

71. Although passenger Rodney Bullard had remained seated in the car quietly the
entire time, to simply obtain his witness statement Officers removed him at gun-
point from the car; handcuffed him; placed him in the back of a police car hand-
cuffed for what seemed like hours at the scene where he was not free to leave and
had just witnessed police kill his friend although not charging him with anything,
then took him handcuffed to the police station to give his "voluntary" statement
in front of police, FDLE, and the MDSAO. Afterward, they took him in a police
car to his neighborhood and dropped him off. These actions included the lead
Prosecutor for the investigation from the MDSAO. Rodney was petrified.

72. At a press conference the following day, the City's Police Chief Morales gave a
materially false statement to the public exonerating his employee. Chief Morales
announced "Officers became aware that one of the individuals was armed. A
struggle ensued and one of the officers discharged his firearm," At no point had
anyone in this encounter ever observed a gun on Antwon. Further, Chief Morales'
statement meant that a gun had been seen prior to the shirt tussle, as opposed to
only after SGT Rosemond shot Antwon, which was untrue. At one point Chief
Morales also stated there had been an exchange of gunfire, although only his Ser-
geant ever fired a weapon.

73. Neither was the lethal force used by SGT Rosemond necessary to prevent Antwon

from fleeing, nor had Rosemond any cause to believe that Antwon had committed a crime involving the threatened infliction of serious physical harm to another.

74. Officer Gonzalez was visibly before SGT Rosemond with no gaping bleeding wounds, serious visible injuries, nor even crying out for help; and Antwon was visibly before SGT Rosemond not in possession of, using or brandishing a gun or any weapon, nor beating, kicking, punching, or pummeling Gonzalez, nor reaching for any weapons of Gonzalez; and Rodney was still sitting quietly in the passenger seat; and nobody else was on the scene; and both Officer Gonzalez and Antwon were upright, when unidentified police Sergeant Rosemond a/k/a the "male voice" who "could not be understood" yelled out something that Gonzalez and Antwon didn't understand or even know was coming from an officer, and took the time to shoot Antwon in the head while missing Officer Gonzalez in the exact same location.

75. Defendants must be held to account here for the unlawful killing of Antwon Cooper under color of law in the scope of employment in violation of Antwon's clearly established constitutional rights named herein.

76. No arrests or terminations will occur to keep SGT Rosemond, and other officers in the future, from shooting and killing the citizenry in this city and county.

### III. FEDERAL CLAIMS

### COUNT I: FOURTH AMENDMENT EXCESSIVE USE OF FORCE

### (42 U.S.C.§ 1983):  DEFENDANT CONSTANT ROSEMOND

77. Ms. Cooper hereby re-alleges and incorporates paragraphs 1 – 76 as if pled herein.

78. SGT Rosemond is being sued in his individual capacity.

79. At no time in this encounter was anybody on the scene or the public in imminent danger from Antwon Cooper, nor was Antwon using physical or aggravated aggression, when SGT Rosemond used lethal force shooting Antwon in the head.

80. SGT Rosemond did not use any lesser force available to him, nor did SGT Rosemond identify himself as a police officer before using lethal force on unarmed Antwon who was visibly not using any weapon or placing Officer Gonzalez or SGT Rosemond in any imminent danger of serious bodily harm or death.

81. At all times material hereto, SGT Rosemond observed that both Antwon and Gonzalez were upright in a non-lethal shirt tussle when arriving on the scene in which Officer Gonzalez was not using any weapon or calling for help, and observed their fall to the ground, wherein Antwon still did not possess or use any weapon, nor beat, pummel, kick, punch Officer Gonzalez or reach for any weapons belonging to Officer Gonzalez.  SGT Rosemond was visibly able to see and perceive the lack of imminent danger of serious bodily harm or death in this scene prior to shooting Antwon, but yet still used lethal force against Antwon, aiming for and shooting Antwon in the head.

82. Under color of law and within the scope of SGT Rosemond's employment, SGT Rosemond violated Antwon's clearly established constitutional right to be free from excessive force upon which Rosemond as a Sergeant was on notice.

83. Rosemond had so many other available alternatives.  Instead, he chose to do what no reasonable officer in that circumstance would have done.

84. As a direct and proximate result of SGT Rosemond's excessive force against Antwon, Antwon suffered the ultimate damages:  he is deceased.  He and his fiancé

will never be married.  He will never have children.  His family will never have grandchildren or great-children from Antwon.  His parents will never see him on this earth again.  They lost the companionship of their son for the rest of their lives. The only place they can visit him is in the graveyard.

WHEREFORE, Ms. Cooper seeks entry of an Order for final judgment against SGT Rosemond for compensatory and punitive damages, attorney's fees, costs, and such other relief that this Court deems just and proper.

## COUNT II:  DELIBERATE INDIFFERENCE (42 U.S.C. and Four-teenth Amendment):  Defendant Constant Rosemond

85. Ms. Cooper hereby re-alleges and incorporates paragraphs 1 – 76 as if pled herein.

86. SGT Rosemond is being sued in his individual capacity.

87. Under Fourteenth Amendment due process, officers are required to render medical aid to persons they injure during police interactions.

88. Additionally, well-settled case law holds that Officers commit deliberate indifference when they know the person has suffered a serious injury with immediate need for adequate care, and do not render aid.

89. Here, SGT Rosemond shot Antwon Cooper in the head and Antwon's head was bleeding profusely, the most serious of medical injuries requiring immediate care.

90. According to the statements in the Investigation File from one of the witnesses, Antwon stumbled a few steps after SGT Rosemond shot him and then fell down.

91. Other legal clinicians assert it is impossible that Antwon was able to get up after being shot in the head and stumble the several feet to the intersection of the

roadway and fall down, with no blood trial on the road despite his head bleeding profusely, and that such rhetoric is attempt to conceal the lack of explanation for why the gun found on the scene is on the other side of the street per the Investigation File and not anywhere near where Antwon's body lay in the street.

92. Regardless, the fact remains that SGT Rosemond is not qualified or credentialed in the State of Florida to pronounce anyone dead.

93. Hence, after shooting someone in the head during his police encounter and causing serious injury, he was no doubt on notice of his duty to render medical aid and Antwon's immediate need for medical care due to the seriousness of Antwon's medical condition, but refused to render aid. Instead, SGT Rosemond walked around post-shooting with his gun still drawn.

94. When first responders and paramedics did arrive, Antwon Cooper was pronounced dead at the scene.

95. SGT Rosemond killed Antwon, and the Death Certificate lists the only cause of death as that shot to the head by SGT Rosemond, who killed an unarmed man.

96. As a direct and proximate result of SGT Rosemond's deliberate indifference against Antwon, Antwon suffered the ultimate damages: he is deceased. He and his fiancé will never be married. He will never have children. His family will never have grandchildren or great-children from Antwon, get to hear him say "I do," and kiss his bride. His parents will never see him on this earth again. They lost the companionship of their son for the rest of their lives. For every Thanksgiving dinner until the parents and grandparents pass away *their son's chair* will sit empty. It is not the natural progression of life for parents to bury their children..

They will never celebrate another birthday of theirs or his with Antwon, and his birthday is the month after the day he was killed. He was killed March 8.  His birthday is April 10. The only place they can visit him is in the graveyard.

WHEREFORE, Ms. Cooper seeks entry of an Order for final judgment against SGT Rosemond for compensatory and punitive damages, attorney's fees, costs, and such other relief that this Court deems just and proper.

## IV. STATE CLAIMS

## COUNT III:  WRONGFUL DEATH (FLORIDA WRONGFUL DEATH ACT):  DEFENDANT ROSEMOND

97. Ms. Cooper hereby re-alleges and incorporates paragraphs 1 – 76 as if pled herein.

98. SGT Rosemond is being sued in his individual capacity.

99. Ms. Cooper sues SGT Rosemond pursuant to F.S. §§ 768.16-768.26, a/k/a Florida's "Wrongful Death Act" for the death of Antwon Cooper.

100.     At all times material hereto, SGT Rosemond, acting under color of law and within the scope of his employment, shot Antwon/used lethal force where no imminent danger of serious bodily harm or death existed to anyone on the scene or public, where Antwon was visibly unarmed and not using any weapon, in violation of Antwon's clearly established constitutional rights, and in violation of Florida law.

101.     SGT Rosemond had lesser types of force available to him when he used excessive force to wrongfully kill Antwon and ample time to utilize that lesser force when he arrived upon the scene where both Gonzalez and Antwon were upright

in the shirt tussle with no weapons in use, he took time to perfectly aim to ensure to not shoot Gonzalez, and no reasonable officer in SGT Rosemond's situation would have used lethal force against Antwon on the scene.

102.     As a direct and proximate result of SGT Rosemond wrongfully causing Antwon's death, Antwon suffered the ultimate damages:  he is deceased.  He and his fiancé will never be married.  He will never have children.  His family will never have grandchildren or great-children from Antwon.  His parents will never see him on this earth again.  They lost the companionship of their son for their lives. No wedding.  No more holidays together. There will be no more texts or calls from Antwon to Ms. Cooper and his grandparents just to check in or say hello.  Not one more Christmas present will ever be under the tree from Antwon  All of the everyday times, and all of the special times, that parents experience with the children throughout life have been taken away because Antwon Cooper on this earth is no more. The only place they can visit him is in the graveyard.

WHEREFORE, Ms. Cooper seeks entry of an Order for final judgment against SGT Rosemond for compensatory and punitive damages, attorney's fees, costs, and such other relief that this Court deems just and proper.

## COUNT IV:  WRONGFUL DEATH (FLORIDA WRONGFUL DEATH ACT):  DEFENDANT CITY OF MIAMI

103.     Ms. Cooper hereby re-alleges and incorporates paragraphs 1 – 76 as if pled herein.

104.     Ms. Cooper sues the City of Miami in its official capacity, pursuant to F.S.

§§ 768.16-768.26, a/k/a Florida's "Wrongful Death Act" for the death of Antwon Cooper.

105.     At all times material hereto, the City had a duty to ensure its' officers used reasonable care in the performance of law enforcement duties so as not to harm or endanger the public or those in police custody.

106.     At all times material hereto, the City's on-duty employee SGT Rosemond, acting under color of law and within the scope of his employment, shot Antwon/used lethal force where no imminent danger of serious bodily harm or death existed to anyone on the scene or public, where Antwon was visibly unarmed and not using any weapon, in violation of Antwon's clearly established constitutional rights to be free from excessive force and deliberate indifference, and in violation of Florida law.

107.     The City trained Rosemond to act in a manner described in this Complaint, *to wit,* to use deadly force and lethal force against unarmed black men, and there would be no arrest or/and termination of the officer, and therefore, the City's conduct was intentional and the death of Antwon was foreseeable.

108.     SGT Rosemond had lesser types of force available to him when he used excessive force to wrongfully kill Antwon and ample time to utilize that lesser force when he arrived upon the scene where both Gonzalez and Antwon were upright in the shirt tussle with no weapons in use, he took time to perfectly aim to ensure to not shoot Gonzalez, and no reasonable officer in SGT Rosemond's situation would have used lethal force against Antwon on the scene.

109.     The City's acts and omissions were the direct and proximate cause of the

death of Antwon Cooper, and the injuries to his survivors and damages suffered by his estate.

110.    Defendant's actions were intentional misconduct; or in the alternative, negligent actions and omissions; in the contravention of Antwon Cooper's clearly established constitutional rights.

111.    As a direct and proximate result of the City's acts and omissions, its on-duty employee SGT Rosemond, acting within the scope of his employment wrongfully killed Antwon, and Antwon suffered the ultimate damages: he is deceased. His long dreads have stopped growing. Never can Ms. Cooper call his number again and hear her son pick up and say "hey beautiful!"  He and his fiancé will never be married.  He will never have children.  His family will never have grandchildren or great-children from Antwon.  His parents will never see him on this earth again.  Sunday, Monday, Tuesday, Wednesday, Thursday, Friday, Saturday: not one day will he walk through the door again.  Not one holiday will he ever sit in his chair at the table or place a present under the tree again.  No more texts, calls, or Facetime. They lost the companionship of their son for the rest of their lives and experienced a parent's worst nightmare: having to bury your child. The only place they can visit him now, is in the graveyard.

WHEREFORE, Ms. Cooper seeks entry of an Order for final judgment against The City for compensatory damages attorney's fees, costs, and such other relief that this Court deems just and proper.

# V.

## ATTORNEY'S FEES

112.  If Plaintiff prevails in this action, by settlement or otherwise, Plaintiff is entitled to and hereby demands attorney's fees under 42 U.S.C. §1988.

# VI.

## JURY DEMAND

113.  Plaintiff respectfully requests a jury trial in this matter.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that judgment be rendered against all Defendants, for an amount in excess of the jurisdictional minimum of this Court. Plaintiff further prays for all other relief, both legal and equitable, to which he may show himself justly entitled.

Respectfully Submitted this 13th day of March 2023

By: /s/ Rawsi Williams
Rawsi Williams, Esq. R.N.
State Bar No. 103201
RAWSI WILLIAMS LAW GROUP
701 Brickell Ave., STE 1550
Miami FL  33131
TEL:  888-RawsiLaw/888-729-7452
Email:rawsi@rawsi.com;
Ajoseph2@rawsi.com;
service@rawsi.com
Attorney for Plaintiff